## Richmond.

### EDWARD PURNELL V. COMMONWEALTH.

January 19, 1922.

Absent, Saunders, J.

RAPE—*Appeal and Error—Evidence Sufficient to Sustain a Verdict of Guilty of Attempted Rape—Alibi.*—In the instant case the evidence is examined and held sufficent to sustain a verdict of guilty of attempted rape, notwithstanding the attempts of accused to prove an alibi by his own testimony and that of his mother and sister, and notwithstanding the fact that while positively identifying accused, who was well known to her, as her assailant, the prosecutrix admitted that she never saw his face. It was the province of the jury to weigh the testimony and settle the disputed facts. The trial court saw the demeanor of the witnesses on the stand, and declined to set the verdict aside. Under these circumstances the Supreme Court of Appeals was unable to say that the verdict was without evidence to support it, or plainly contrary to the evidence.

Error to a judgment of the Circuit Court of Northampton county.

*Affirmed.*

The opinion states the case.

*S. James Turlington* and *Elmer W. Somers,* for the plaintiff in error.

*John R. Saunders, Attorney General; J. D. Hank, Jr., Assistant Attorney General,* and *Leon M. Bazile, Second Assistant Attorney General,* for the Commonwealth.

BURKS, J., delivered the opinion of the court.

The plaintiff in error, Edward Purnell, was convicted of attempted rape upon Mrs. Elizabeth C. Kelly, and sentenced to be electrocuted. The attempt is clearly and explicitly proved and is in no way controverted. The plaintiff in error earnestly contends that he was not the guilty party, and attempts to prove an alibi by his mother and sister, in addition to his own testimony. He also offered testimony to his good character for chastity and for truthfulness. There is no complaint of the rulings of the trial court on the admissibility of evidence, nor on the law applicable to the evidence. The sole question involved and the only one we are asked to consider is, was the evidence sufficient to warrant the jury in finding that the plaintiff in error was the guilty party. The prosecutrix, Mrs. Kelly, after describing the attack upon her, says that when Purnell abandoned his attack he jumped out to the ground, a distance of four or five feet, and that she got to the window by the time he reached the ground, and that she recognized him at once. She admits that she never saw his face, but she is very positive and explicit in her statements on the subject of recognition. The assault was made between eight and twelve o'clock at night, but Mrs. Kelly describes the night as "moonlight; bright as day almost." She was well acquainted with the accused, who had been working for her husband for at least a year and a half, and was in and out of her kitchen almost daily. She testified that when "he went to the window and jumped out I recognized him running through the yard, and I told him not to run, that I knew who he was," and that it was Edward Purnell, the accused; that she saw him again "when he went to the barnyard and when he turned around the cornstack"; that the night was sufficiently bright for her to see him, and that she recognized him from his back and his running; that she "was very familiar with that; I know it was his back," and could not have been any one's else, and that he had "on this khaki-colored clothes, not

overalls." She testified further, "I knew who it was when I got a glimpse of him."

Mrs. Kelly also testified that during the struggle she bit her assailant several times hard enough to make a bruise, once on the leg and at another time she did not know where, but thinks once on the arm. The accused at this time was wearing shoes, without heels, and they had wires in the soles at the toe that made peculiar marks. Tracks identified as made by these shoes were found in the soil not far from the house, and going in that direction. The accused, however, accounted for these tracks by saying that he had gone to the Kelly residence about two o'clock of the day the offense was committed and had passed along that way in going to the house to get Mr. Kelly's horses which he had borrowed to use in planting potatoes that day. Mr. Kelly, husband of the prosecutrix and a witness for the Commonwealth, testified that he had loaned his horses to the accused, but that he had come for them early in the morning and had come by another route. Sears, another witness for the Commonwealth, also testified that he was planting potatoes on that day on land adjacent to Mr. Kelly and that he saw Purnell about sunset going to the Kelly house in a wagon, but says nothing of having seen him at any other time of that day.

The accused was arrested at his home, about three-quarters of a mile from the Kelly residence, at two o'clock the night of the assault, by Mrs. Kelly's husband and his brother, who was a deputy sheriff. He testified in his own behalf with apparent frankness, and undertook to give an account of his movements that night, and denied positively any connection with the assault. Several witnesses, however, for the Commonwealth testified to prior contradictory statements made by him as to where and with whom he was in the early part of the night, and as to the time he was with those persons. The statements of the accused were,

in the main, corroborated by the testimony of his mother and sister, who were in the house with him.

Unless Mrs. Kelly was mistaken as to the identity of her assailant, there can be no doubt as to the guilt of the accused. One of the arguments for the accused to show that she was so mistaken was the failure to find any bruise on the accused resulting from the bites, although he was examined for such bruises at the time of his arrest. Witnesses for the Commonwealth testify that the accused raked his finger-nails up his leg when they went to look for the bruises, and that the effect of this upon the skin of a negro would obscure the bruises. The accused and his mother and sister, who were present, denied this allegation.

All of this testimony went before the jury under proper instructions from the court. These instructions emphasized time and again the duty of the jury to be satisfied of the guilt of the accused beyond a reasonable doubt, and that not only the jury as a whole, but each individual juror should be so satisfied, and should not surrender his own convictions simply because the rest of the jury were of a different opinion. They also informed the jury that any fact or facts sufficient to produce a reasonable doubt as to the guilt of the accused need only be established by proof that would be satisfactory to establish such fact or facts in a civil case and that the prisoner was not bound to prove his alibi beyond a reasonable doubt, but only by a preponderance of the evidence. The instructions made it plain to the jury that if there was any doubt as to the identity of the prisoner as the person who committed the offense they should give him the benefit of that doubt. It was the province of the jury to weigh the testimony and to settle all of the disputed facts in the case. They found the accused guilty and annexed the extreme penalty of the law to their finding. The judge of the trial court saw the demeanor of the witnesses on the stand and declined to set the verdict aside. Under

these circumstances we are unable to say that the verdict is without evidence to support it, or that it is plainly contrary to the evidence. The judgment of the trial court must, therefore, be affirmed.

*Affirmed.*